NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

SHARON DAVIS,

                   Plaintiff,              CIVIL NO. 04-5317 (GEB)

    v.

THE CITY OF NEWARK, et al.,

                   Defendants.        **MEMORANDUM OPINION**

**BROWN, Chief District Judge**

This matter comes before the Court upon Defendants City of Newark, *et al.* (hereinafter "Defendants") Motion to Dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) [Docket Entry # 4]. The action was reassigned to the undersigned on August 7, 2006, and the Court, having read and fully considered all of the parties' submissions, has decided this matter without oral argument pursuant to Fed. R. Civ. P. 78. For the reasons discussed below, Defendants' Motion to Dismiss is granted in part and denied in part.

**I.      BACKGROUND**

Plaintiff Sharon Davis (hereinafter "Plaintiff") filed a seven count Complaint. Count One alleges race discrimination and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964; Count Two alleges retaliation for complaints of race discrimination in violation of Title VII, 42 U.S.C. § 2000(e); Count Three alleges freedom of speech violations pursuant to 42 U.S.C. § 1983; Count Four alleges a failure to train and/or supervise in violation of 42 U.S.C. § 1983; Count Five seeks a petition for redress pursuant to 42 U.S.C. § 1983; Count

Six alleges race discrimination in violation of the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1, et seq.; and Count Seven alleges retaliation in violation of the New Jersey Law against Discrimination in violation of N.J.S.A. 10:5-1, et seq.  The factual allegations of this Complaint include the following: Plaintiff, an African American woman, asserts that she graduated from the Newark Police Academy on or about September 30, 1994.  (Compl., ¶ 1). Thereafter, Plaintiff began her full-time employment with the City of Newark as a police officer. (*Id.*).  Plaintiff was initially assigned to work at the North District precinct in Newark, New Jersey.  At the beginning of her assignment, she was placed on vacation, returning in or about October, 1994.  (*Id.* at ¶¶ 5, 6).

Upon her return from vacation, Plaintiff realized that she was being treated "differently" than her white male counterparts, as the counterparts would request roster changes in order to avoid working with Plaintiff and as African American officers were partnered with other African American officers by the supervisory personnel.  (*Id.* at ¶¶ 7-9).  Further, white, male officers were protected when they did not appear for work as others would report them present and in the field.  (*Id.* at ¶ 16).

In or about November 1994, Plaintiff was partnered with another officer who was also responsible for training Plaintiff.  Plaintiff was required to drive the police vehicle at all times relevant.  Plaintiff's partner and trainer informed Plaintiff that he was ordered not to drive, but to have Plaintiff do the driving.  (*Id.* at ¶ 10).

On or about February 25, 1997, Plaintiff was given an official warning for excessive sick leave for the year 1996.  However, Plaintiff alleges that the calculations of sick time taken were incorrect.  She further alleges that the culmination of sick leave does not carry from previous

-2-

years and any reprimand should have been given in 1996.  (*Id.* at ¶ 11).

According to her complaint, on or about July 10, 1997, Plaintiff claims that she was verbally "badgered" by the dispatcher on duty at the time.  However, Plaintiff was required to submit a report on unnecessary radio transmissions.  The dispatcher was not reprimanded for the incident, and "many male officers were not subjected to similar treatment for similar offenses."  (*Id.* at ¶ 12).

On or about January 29, 1998, Plaintiff overheard one fellow officer complaining to another fellow officer that Plaintiff was "a pain in his balls" because Plaintiff was being paid overtime for medical treatment for an on-duty injury.  Plaintiff asserts, however, that "white male officers were not subjected to this same treatment."  (*Id.* at ¶ 13).  Plaintiff thereafter submitted a report regarding the aforementioned comments.  Plaintiff never received a response.  (*Id.* at ¶ 14).  On or about February 3, 1998, immediately following the submission of her report, Plaintiff was investigated regarding the care of police property and use of the city issued gasoline credit card.  Plaintiff pled guilty and was issued a command reprimand, however, she alleges that "white, male officers were not subjected to these types of written reprimands."  (*Id.* at ¶ 15).

On or about February 23, 1998, a sergeant of the Newark Police Department visited Plaintiff's home to serve her with a "tour change", which Plaintiff alleges was issued in retaliation for Plaintiff's complaint about the January 29, 1998 comment made by a fellow officer.  (*Id.* at ¶ 17).

On or about August 4, 1998 and August 16, 1998, Plaintiff was investigated for acts of insubordination and theft, respectively.  Plaintiff was found not guilty regarding the acts of insubordination and the accusation of theft was later recanted.  (*Id.* at ¶¶ 18, 19).

-3-

Plaintiff alleges that on or about February 17, 1999, a sergeant of the Newark Police Department killed his child's mother and then himself.  Plaintiff asserts that the sergeant had previously received preferential treatment which made it "possible to take these horrible actions." (*Id.* at ¶¶ 20, 21).  After reporting same, Plaintiff was called into a meeting with another sergeant that requested that Plaintiff amend her report because of the repercussions that could occur as a result of Plaintiff's comments.  (*Id.* at ¶ 22).

Thereafter, in or about the late summer of 1999, Plaintiff became aware that a certain officer had his license suspended and was subsequently assigned to a desk job, in violation of the City of Newark Police Department's rules and regulations.  Plaintiff reported the situation, and on or about September 23, 1999, found the right rear tire of her car slashed, which she believed to be in retaliation for the report she had previously filed.  (*Id.* at ¶¶ 23, 24).  No action was taken to investigate the incident.  (*Id.)*.

On or about November 16, 1999, Plaintiff reported smoking within the precinct, which was prohibited.  A memorandum was issued by the Captain informing officers that smoking within the precinct would not be tolerated.  Fellow officers hypothesized that a fellow female officer had probably complained, stating "that bitch Pat Kines probably submitted the report." Plaintiff informed the officers that it was she, and not Ms. Kines that had reported the smoking. Thereafter, the officers in question spoke in Spanish when Plaintiff was present.  (*Id.* at ¶¶ 25, 26).

On or about December 31, 1999, Plaintiff used a sick day due to her pregnancy.  Plaintiff claims that two officers and the city doctor came to Plaintiff's home to check Plaintiff's blood pressure to ensure that she was truly ill, under the Chief's orders that all officers who called in

sick were to be paid house visits to ensure that the officers were not attempting to avoid the New Year's shift.  The city doctor reported that Plaintiff's blood pressure was very high, and then the officers and the city doctor left.  They allegedly did not treat Plaintiff or instruct her to seek medical attention.  (*Id.* at ¶ 27).

On or about September 13, 2001, Plaintiff submitted a report regarding safety issues regarding the Brazilian Festival.  Plaintiff was allegedly asked to re-submit her report seeking clarification regarding her comments of preferential treatment of others.  (*Id.* at ¶ 28).

On or about January 18, 2002, Plaintiff submitted a report regarding a fellow officer she had been assigned to train as he was having trouble filling out reports.  Plaintiff claims that she received no response regarding this report.  (*Id.* at ¶ 29).

On or about July 29, 2002, Plaintiff was promoted to Detective.  Upon her promotion, Plaintiff asserts that a higher ranking officer called her into his office and stated that he had heard that she was a "pain in the ass" and he expected not to have any problems from her.  Plaintiff complained to the Captain with regards to the comment.  Plaintiff alleges that the Captain stated that he had actually made the comment, but it was not meant in that context and that the other officer had a problem with female officers.  (*Id.* at ¶ 30).  The higher ranking officer was later investigated by Internal Affairs for a separate incident.  Plaintiff was interviewed on video tape, and she referenced the incident in which she was called a "pain in the ass."  Plaintiff believes that the higher ranking officer was permitted to view the video tape and thereafter treated Plaintiff in a disparate manner.

In or about May of 2003, a fellow officer allegedly requested to be removed from the squad because of Plaintiff.  He later apologized, saying that he was having problems at home.

(*Id.* at ¶ 32).

On or about July 22, 2003, Plaintiff was informed that she was being removed from the squad base upon the previously referenced higher ranking officer's request.  Plaintiff believes that this was retaliation for her video taped interviewed.  (*Id.* at ¶ 33).

On or about January 14, 2004, Plaintiff submitted a report regarding offensive comments that were made about a fellow officer.  Plaintiff claims that she was subsequently subjected to retaliation by a higher ranking officer as he consistently sent Plaintiff to stand duty at the hospital to guard prisoners, which is generally considered to be an extremely poor detail.  (*Id.* at ¶ 35).

On or about April 2, 2004, Plaintiff submitted a complaint with the Equal Employment Opportunity Commission and the New Jersey Division on Civil Rights regarding the retaliation and race discrimination that she had allegedly suffered.  (*Id.* at ¶ 36).  Thereafter, Plaintiff submitted reports regarding discrimination, retaliation against her and preferential treatment of others on or about April 11, 2004, April 30, 2004, and September 26, 2004 which was in response to yet another transfer.  (*Id.* at ¶¶ 37-40).  On or about October 4, 2004, Plaintiff was called to a meeting to discuss her reports.  Plaintiff was specifically questioned regarding her failure to follow the chain of command.  (*Id.* at ¶ 41).  Plaintiff contends that discriminatory and retaliatory actions continue to occur against her.

## II.     STANDARD OF REVIEW

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the Complaint as true, and viewing them in the light most favorable to Plaintiff, Plaintiff is not entitled to relief.  *Oran v. Stafford*, 226 F.3d 275, 279 (3d Cir. 2000); *Langford v. City of Atl. City*, 235 F.3d 845, 850 (3d Cir. 2000); *Bartholomew*

*v. Fischl*, 782 F.2d 1148, 1152 (3d Cir. 1986).  The Court may not dismiss the Complaint unless Plaintiff can prove no set of facts that would entitle her to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Angelastro v. Prudential-Bache Sec., Inc.*, 764 F.2d 939, 944 (3d Cir. 1985), *cert. denied*, 474 U.S. 935 (1985).  "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Jackson v. Birmingham Bd. of Educ.*, 125 S. Ct. 1497, 1510 (2005) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

Under Rule 12(b)(6), the Court must "accept the allegations in the complaint as true, and draw all reasonable factual inferences in favor of the plaintiff.  [The motion can be granted] only if no relief could be granted under any set of facts that could be proved."  *Turbe v. Gov't of the V.I.*, 938 F.2d 427, 428 (3d Cir. 1991) (citing *Unger v. Nat'l Residents Matching Program*, 928 F.2d 1392, 1394-95 (3d Cir. 1991)); *see also Langford*, 235 F.3d at 850; *Dykes v. SE. Pa. Transp. Auth.*, 68 F.3d 1564, 1565, n.1 (3d Cir. 1995), *cert. denied*, 517 U.S. 1142 (1996); *Piecknick v. Commw. of Pa.*, 36 F.3d 1250, 1255 (3d Cir. 1994); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).  A complaint may be dismissed for failure to state a claim where it appears beyond any doubt "that no relief could be granted under any set of facts that could be proved consistent with the allegations."  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

A complaint should not be dismissed unless it appears beyond doubt that "the facts alleged in the complaint, even if true, fail to support the claim." *Ransom* v. *Marrazzo*, 848 F.2d 398, 401 (3d Cir. 1988).  Legal conclusions made in the guise of factual allegations, however, are given no presumption of truthfulness. *Papasan v. Allain*, 478 U.S. 265, 286 (1986); *see also*

*Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) ( "[A] court need not credit a complaint's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss.").

A Rule 12(b)(6) motion is properly presented in the context of employment discrimination allegations under both Title VII and NJLAD.  *See Mitchell v. New Jersey Lottery*, 2006 WL 1344092 (D.N.J. 2006); *Harper v. Robert J. Casey, Jr. & Associates*, 1996 WL 363913 (E.D.Pa. 1996); *Dill v. Com. of Pa.*, 3 F.Supp.2d 583 (E.D.Pa. 1998) (all considering Rule 12(b)(6) motions regarding Title VII claims) and *DeMaria v. The Home Depot*, 1998 WL 1750127 (D.N.J. 1998); *Mitchell v. New Jersey Lottery,* 2006 WL 1344092 (D.N.J. 2006) (all considering Rule 12(b)(6) motions regarding NJLAD claims).

## III.    DISCUSSION

### A.    <u>Individual Liability Under Title VII</u>

Defendants first assert that Plaintiff has named various defendants individually in the Complaint under Title VII, contrary to Third Circuit precedent.  Plaintiff responds by asserting that the Complaint contains two counts alleging violations of Title VII, specifically, counts one and two, and "acknowledges" that said counts are not alleged against individually named defendants.

All counts of the Complaint contain the following language in pertinent part: "[A]s a direct result of defendants' actions, including the actions of the John & Jane Doe Entities/Corporations and the John and Jane Does, Plaintiff has been harmed."  The language of the Complaint implicates every Defendant listed, individually and under color of state law. However, as Defendants point out, the Third Circuit has held that there is no individual liability under Title VII.  *See In re Montgomery County*, 215 F.3d, 367, 372-73 (3d Cir. 2000) (holding

that under Title VII a public official may only be held liable in his or her official capacity and may not be held personally liable).

In accordance with Third Circuit precedent, and with concurrence from the parties, those portions of Counts One and Two within the Complaint that allege individual liability of defendants named and unnamed shall be dismissed.

### B. Individual Liability Under NJLAD

Defendants next assert that although the New Jersey Supreme Court has yet to address the issue as to whether individual employees may be held directly liable under the New Jersey Law Against Discrimination (hereinafter "NJLAD") state statute, the Third Circuit has predicted that when the issue is presented, the New Jersey Supreme Court will likely conclude that supervisors and other employees will not be able to be held directly liable.

Plaintiff responds that the NJLAD statute itself provides for individual liability, as it defines a person as including one or more individuals.  *See* N.J.S.A. 10:5-12.  Further, the Third Circuit in *Failla v. City of Passaic*, 146 F.3d 149 (3d Cir. 1998) held that supervisors found to aid and abet under NJLAD could be individually liable.  As such, Plaintiff asserts, individual liability under NJLAD is permitted.

Plaintiff has pled claims of race discrimination and retaliation under NJLAD in counts six and seven of her Complaint against all Defendants, including those individually named. Although the Third Circuit has rejected the proposition of individual liability under Title VII, it has not with regards to individual liability under NJLAD.  On its face, NJLAD contains a separate provision which expressly contemplates individual liability for those who "aid or abet" an employers unlawful employment actions.  *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95,

126 (3d Cir. 1999).  The provision makes it unlawful for "any person, whether an employer or employee or not, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NJLAD], or to attempt to do so."  N.J.S.A. 10:5-12 (e).  However, the Third Circuit has opined that only employees who maintain supervisory authority can be held individually liable under NJLAD as "aiders and abettors."  *Hurley* at 129.

Furthermore, NJLAD contains an anti-retaliation provision, which deems it unlawful for "any person to take reprisals against any person because that person has opposed any practices or acts" which the Act prohibits.  N.J.S.A. 10:5-12(d).  This provision expressly addresses and imposes liability for individual supervisory employees.  *See Cortes v. University of Medicine and Dentistry of N.J.*, 391 F. Supp. 2d 298 (D.N.J. 2005).

The Court therefore denies the individual defendants' motions to dismiss the allegations asserted against them under NJLAD in Counts Six and Seven of the Complaint.

**C.    Establishment of a Hostile Work Environment Under Title VII**

Defendants further argue in their Motion to Dismiss that Plaintiff can prove no set of facts that would entitle her to relief pursuant to her claims of a hostile work environment under Title VII.  Plaintiff responds by recapitulating the allegations in her underlying Complaint.

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  The scope of Title VII "is not limited to economic or tangible discrimination [and] . . . covers more than terms and conditions in the narrow contractual sense."  *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115-16 (2002).

The Third Circuit has articulated five factors that must be proven in order to establish the existence of an actionable hostile work environment under Title VII.  Specifically, Plaintiff must prove: "(1) that she suffered intentional discrimination because of her race or sex; (2) that the discrimination was pervasive and regular[1]; (3) that the discrimination detrimentally affected her; (4) that the discrimination would detrimentally affect a reasonable person of the same race or sex in that position; and (5) the existence of *respondent superior* liability."  *Weston v. Commonwealth of Pa.*, 251 F.3d 420, 425-26 (3d Cir. 2001).

Put another way, an actionable hostile work environment requires proof that Plaintiff was subjected to a level of gender or race-based harassment which was "severe or pervasive" enough to create a working environment which is both subjectively and objectively abusive or hostile to females or African American employees.  *See Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993); *see also Clark County Sch. Dist. v. Breeden*, 121 S. Ct. 1508, 109-10 (2001) (reaffirming that conduct not severe enough to create an objectively hostile or abusive work environment is beyond Title VII's purview).

A court must consider the totality of the circumstances when determining whether the alleged harassment is sufficiently severe or pervasive to constitute a hostile work environment.  *Andrews v. City of Phila.*, 895 F.2d 1469, 1482 (3d Cir. 1990).  Factors which may indicate a hostile work environment include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance;

---

[1]  In *Jenson v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006), the Third Circuit definitively adopted the United States Supreme Court's "severe or pervasive standard."  *Id.* (citing *PA. State Police v. Suders*, 542 U.S. 129, 133 (2004)).  Prior to *Jensen*, the Third Circuit oscillated between a "severe or pervasive" and a "pervasive and regular standard."  *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 277 (3d Cir. 2001); *Bouton v. BMW of N. Am., Inc.*, 29 F.3d 103, 106 n.2 (3d Cir. 1994).

and (4) whether it unreasonably interferes with an employee's work performance.  *Harris* at 23.

Here, the Court is not persuaded that any of the incidents that have allegedly occurred, either alone or within their totality suffice to satisfy the "sufficiently severe or pervasive" standard.  First, the allegations made by Plaintiff are not clearly based upon her African American status.  Indeed, none of the comments that were made against her contain any indications, either explicitly or implicitly, that Plaintiff's race was the motivating factor, a requirement under Title VII.  *Evans v. Nine West Group, Inc.*, 2002 WL 550477 (E.D. Pa. 2002) (finding that although it was unnecessary for a Title VII defendant to use words that overtly implicate racism in order to create a hostile workplace, comments which cannot be reasonably construed as invoking any racial feeling are insufficiently severe to warrant Title VII liability) (*citing Wiley v. Citibank, N.A.*, 2001 357322 at *5 (S.D.N.Y. 2001).  Further, none of the actions presented by Plaintiff show favoritism for one race over another.  For example, grouping races and national origins together for patrol purposes is not in and of itself discriminatory, as every group and nationality was affected.  Officers asking for reassignment because they purportedly did not wish to work with Plaintiff also fails to implicate Plaintiff's race any more than it would implicate her personality, temperament, or any other number of factors that tend to cause favor or disfavor between co-workers.  It is axiomatic that asserting events and then asserting a racial bias, as Plaintiff appears to do in her Complaint, does not necessarily support a link between the two.

Additionally, the preferential treatment towards white employees that Plaintiff asserts is also unsupported.  There is absolutely no suggestion that Plaintiff was necessarily excluded from this activity because of her race.  Plaintiff fails to allege sufficient facts to conclude that her co-

workers' efforts to work with others and switch positions on rosters were based on race.

Assuming *arguendo* that the causation for the proposed hostile work environment was racially motivated, the frequency of the conduct was minimal, as the events to which Plaintiff refers span a period in excess of ten years.  *See Dieser v. Gloucester County Office of the Sheriff*, 2006 WL 827788 (D.N.J. 2006) (holding that twenty incidents in ten years too infrequent to impose Title VII liability); *see also Cooper-Nicholas v. City of Chester, P.A.*, 1997 WL 799443 (E.D.Pa. 1997) (eight incidents in nineteen months insufficient for Title VII liability); *Gharzouzi v. Northwestern Human Servs. Of Pa.*, 225 F. Supp. 2d 514, 536 (E.D. Pa. 2002) (six incidents in three months insufficient).

Finally, Plaintiff fails to allege any physical threats or humiliations, or that it unreasonably interfered with her work performance, as Plaintiff alleges that "[t]he discriminatory treatment based on Davis's race and gender continued, but Davis continued to perform her duties in a responsible manner."[2]  (Complaint at ¶ 34).

Therefore, as Plaintiff fails to allege sufficient facts necessary to satisfy the severe and persuasive requirement for a hostile work environment claim under Title VII, that portion of Count One so alleging is dismissed.

### D.    Establishment of a Hostile Work Environment Under NJLAD

NJLAD, like its federal Title VII counterpart, requires that employees shall work in an

---

[2]  Although this paragraph of Plaintiff's Complaint alleges gender as a basis for discrimination, none of the actual counts of the Complaint allege gender discrimination. Nevertheless, assuming such allegations did exist, Plaintiff would again fail, based upon the allegations of the Complaint, to satisfy the severe or persuasive threshold necessary to successfully assert a Title VII claim based upon gender discrimination.  *Nickerson v. Potter*, 102 Fed. Appx. 936 (6th Cir. 2004) (holding that plaintiff failed to produce any evidence supporting a claim of a hostile work environment because of gender).

environment which is relatively free from discriminatory intimidation, ridicule and insult.

*Lehmann v. Toys R' Us, Inc.*, 132 N.J. 587, 601 (1993).  In order to make a cognizable hostile

work environment claim under NJLAD, a plaintiff must prove that the harassing conduct about

which she complains: (1) would not have occurred but for her race or gender; and that it was (2)

severe or pervasive enough to make a (3) reasonable woman or African American believe that (4)

the conditions of her employment have been altered and her work environment has become

hostile or abusive.  *Id.* at 603-604.

  The Third Circuit has found that the elements for a hostile work environment claim under

NJLAD "closely resemble the first four elements of [a] Title VII hostile work environment

claim."  *Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001); *Taylor v. Metzger*, 152 N.J.

490, 507 (1998) (holding that the NJLAD's severe or pervasive test "conforms to the standard for

establishing workplace racial or gender harassment under Title VII law"); *Watkins v. Nabisco

Biscuit Co.*, 224 F. Supp. 2d 852, 864 n.18 (D.N.J. 2002) (opining that any plaintiff who has

satisfied a Title VII case will have shown the elements required under NJLAD); *Hargrave v.

County of Atlantic*, 262 F. Supp. 2d 393 (D.N.J. 2003) ("this Court's analysis of Plaintiff's

allegations of sexual and racial harassment applies equally to both her Title VII and NJLAD

hostile work environment claims").

  Consistent with the findings above, this Court holds that the similarities between Title VII

and NJLAD are significant enough to find that the reasons stated above regarding Title VII

liability apply to NJLAD liability as well.  As Plaintiff has failed to satisfy the severe or

persuasive requirements necessary to invoke Title VII liability, she has also failed to satisfy the

duplicative threshold set forth under NJLAD.  Therefore, reviewing Plaintiff's claims on their

face in the light most favorable to her, this Court nevertheless finds that Plaintiff is not entitled to relief.  As such, that portion of Count Seven which alleges a hostile work environment under NJLAD shall be dismissed.

### E.   Establishment of Racial Discrimination Under Title VII and NJLAD

Plaintiff also brings claims against Defendants for discrimination based upon race under Title VII and NJLAD.  Discrimination claims brought under Title VII and NJLAD must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502 (1993).[3]  The framework consists of three steps.  First, a plaintiff must present sufficient evidence to support a prima facie case of discrimination.  *Hicks*, 509 U.S. at 506.  Once the plaintiff establishes a prima facie case, the burden of production then shifts to the defendant, who must articulate a legitimate, nondiscriminatory reason for its actions.  *Hicks*, 509 U.S. at 507; *Burdine*, 450 U.S. at 254; *McDonnell Douglas*, 411 U.S. at 802.  If the defendant satisfies this burden, the reviewing court must proceed to the third step.  At this stage, the burden of production shifts back to the plaintiff who must come forward with admissible evidence showing that the defendant's articulated nondiscriminatory reasons were not the true reasons for the adverse action, but merely a "pretext for discrimination."  *Hicks*, 509 U.S. at 507-08; *Burdine*, 450 U.S. at 253.  Although the evidentiary burdens shift between the plaintiff and the defendant, the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

---

[3]  "Analysis of a claim made pursuant to the NJLAD generally follows analysis of a Title VII claim."  *Schurr v. Resorts Int'l Hotel, Inc.*, 196 F.3d 486, 498 (3d Cir. 1999).  Therefore, the analysis of Plaintiff's Title VII claim of discrimination on the basis of race applies to Plaintiff's identical claim under the NJLAD.

against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253.

In order to establish a prima facie case of discrimination, the plaintiff must prove that: 1) she belongs to a protected class; 2) she was qualified for the position; 3) she suffered an adverse employment action; and 4) the adverse action occurred under circumstances that give rise to an inference of discrimination. *Burdine*, 450 U.S. at 253-54; *McDonnell Douglas*, 411 U.S. at 802.

In *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1296-97 (3d Cir. 1997), the Third Circuit described the type of adverse employment decision that is actionable under Title VII. The adverse employment action must be "sufficiently severe as to alter the employee's 'compensation, terms, conditions, or privileges of employment,' or to 'deprive or tend to deprive [him or her] of employment opportunities or otherwise adversely affect his [or her] status as an employee.'" *Id.* (citing and quoting 42 U.S.C. § 2000e-2(a)(1) and (2)). The court articulated that not all workplace conduct that one may perceive as harassment qualifies as an actionable adverse employment action. *Id.* at 1297. Moreover, "not every insult, slight, or unpleasantness gives rise to a valid Title VII claim." *Id.* The Supreme Court further characterized a tangible employment action as one that "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753-54 & 761 (1998).

Here, Plaintiff fails to make a prima facie case of discrimination because she does not demonstrate that she suffered an adverse employment action. Plaintiff contends that she suffered numerous adverse employment actions, alleging the incidences articulated above. However, Plaintiff has failed to demonstrate that there was adverse employment action of any kind

regarding any the allegations Plaintiff has asserted in her Complaint.  Further, Plaintiff has failed to demonstrate that these allegations, if considered adverse employment action, were "sufficiently severe" as to alter Plaintiff's "compensation, terms, conditions, or privileges of employment."

For example, Plaintiff asserts that after she called in sick to work, the city doctor and a higher ranking employee of the City of Newark Police Department came to Plaintiff's home to determine if she was in fact ill.  However, Plaintiff admits that the higher ranking employee told Plaintiff that the Chief of Police ordered house visits for all officers who had called out sick to ensure that individuals were not attempting to avoid New Year's Eve detail and the potential issues implicated with the changing of the year to 2000.  If the Chief of Police required these house visits to anyone who called in sick, this fails to support the conclusion that Plaintiff suffered an adverse employment action against Plaintiff.

Likewise, the allegations that Plaintiff received written and oral reprimands for procedural errors, that white officers who had committed identical errors did not receive, were not ultimately adverse as Plaintiff was promoted in 2002 to the position of Detective.

Further, assertions by Plaintiff that co-workers fraudulently assisted other co-workers with shift attendances and that negative comments regarding Plaintiff were made do not implicate any adverse employment actions towards Plaintiff.

Even if this Court were to assume that the allegations Plaintiff asserts qualify as adverse employment actions, there is nothing within the surrounding circumstances that give rise to an inference of racial discrimination.  Procedural errors were administratively addressed, employees were visited to confirm sickness during the New Year's Eve shift, fellow co-workers fraudulently assisted other co-workers with shift attendances, and negative but non-discriminatory comments

were made.  None of these events, either alone or in concert, provide any inference of racial discrimination.

The Court therefore concludes that none of incidences alleged in Plaintiff's Complaint amount to an adverse employment action.  Plaintiff does not contend that her employer's actions altered her compensation.  Plaintiff does not allege that she was fired, demoted, suspended, or denied a promotion.  Instead, Plaintiff has alleged a number of isolated, specific incidences over a ten year period that merely illustrate an alleged difficult relationship between Plaintiff and at least some of her co-workers and/or supervisors.  Such actions are not cognizable under Title VII or NJLAD.  Consequently, Plaintiff's claims of racial discrimination under Title VII and NJLAD as set forth in Counts One and Six of her Complaint shall be dismissed as a matter of law as Plaintiff's allegations, even if true, would not constitute employment discrimination because of her race.

### F.  Establishment of Retaliation Under Title VII

Defendants next assert that Plaintiff can prove no set of facts that would entitle her to relief pursuant to her claims of retaliation under Title VII.  The anti-retaliation section of Title VII provides in pertinent part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).  A plaintiff, to assert a prima facie case of retaliation under Title VII, must allege that: (1) she was engaged in a protected activity known to the employer; (2) she was thereafter subjected to an adverse employment decision by the employer; and (3) there was a causal link between the protected activity and the adverse employment decision.  *Woodson v.*

*Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997).  To satisfy the causation element, a plaintiff

must raise the inference that her protected activity was the likely reason for the adverse action.

*Ferguson v. E.I. DuPont de Nemours & Co.*, 560 F. Supp. 1172, 1200 (D.Del. 1983).  A

plaintiff's ultimate burden in a retaliation case is to convince the fact-finder that retaliatory intent

had a determinative effect on the employer's decision.  *Saner v. Synthes*, 204 F.3d 494, 501 (3d

Cir. 2000).

An "adverse employment action," as described in the third prima facie element, "alters

the employee's compensation, terms, conditions, or privileges of employment."  *Cortes v. Univ.*

*of Med. & Dentistry*, 391 F. Supp. 2d 298, 312 (D.N.J. 2005) (citations omitted).  As such,

> while a discharge or a refusal to hire would be actionable adverse employment
> actions, "when one goes beyond that, the conduct must be serious and tangible
> enough to materially alter an employee's terms and conditions of employment or
> adversely affect her status as an employee."  Not everything that makes an employee
> unhappy 'qualifies as [an adverse employment action], for [o]therwise, minor and
> even trivial employment actions that an irritable, chip-on-the-shoulder employee did
> not like would form the basis of a discrimination suit.'"

*Id.* (internal citations omitted).  Rather, a tangible employment action "in most cases inflicts

direct economic harm."  *Burlington Indus. v. Ellerth*, 524 U.S. 742, 762 (1998).

Here, Plaintiff sets forth several allegations in her Complaint to support her retaliation

claims under Title VII.  Specifically, Plaintiff alleges that she was: (1) initially required to drive

the police vehicle at all times during her shifts at work; (2) reprimanded regarding excess sick

leave in the wrong calendar year; (3) reprimand for procedural errors after reporting numerous

procedural violations by certain co-workers and supervisors; (4) subjected to numerous tour

changes and poorly viewed details; (5) the victim of a tire slashing which was reported but not

acted upon by supervision; (6) subjected to a home visit by supervision and the city doctor after

she called out sick; and (7) removed from her squad.

As previously asserted, this Court finds no adverse employment decisions made against Plaintiff.  Further, none of these allegations contain a discharge or refusal to hire, nor do they materially alter Plaintiff's terms of employment or affect her status as an employee.  To the contrary, Plaintiff's status was improved in 2002 when she was promoted to Detective.  Conditions of employment, however, were altered, as Plaintiff asserts several tour changes, including a squad reassignment and a prison hospital tour that was allegedly considered a "poor" assignment.

Nevertheless, there is no information provided in Plaintiff's Complaint to suggest what the standing procedure within the City of Newark's Police Department was regarding tour changes, i.e., whether tour changes are a necessary function of the department or something utilized in retaliation.  Because there is no known connection between the tour changes and the charges of retaliation, and because Plaintiff does not allege that these tour changes resulted in either economic harm nor an alteration of job title, this Court does not find that Plaintiff has satisfied the prima facie factors requiring an adverse employment decision by an employer and a causal link between the protected activity and the adverse employment decision.  *See Greene v. DaimlerChrysler Services of North America*, 128 Fed.Appx. 353 (5th Cir. 2005) (African-American employee's transfer was not an adverse employment action under Title VII, as was required to establish a prima facie case of retaliation); *see also Delrio v. University of Connecticut Health Care*, 292 F.Supp. 2d 412 (D.Conn. 2003) (voluntary transfer did not cause any materially adverse change in terms or conditions of employee's work, in that she retained same pay and same job title).  As such, Plaintiff's Title VII retaliation claim as set forth in Count

Two of her Complaint shall be dismissed.

### G.      Establishment of Retaliation Under NJLAD

        Defendants' final basis for their Motion to Dismiss is that Plaintiff fails to prove any set

of facts that would entitle her to relief pursuant to her claims of retaliation under NJLAD.

NJLAD, like Title VII, forbids retaliation for the exercise of rights it proposes to protect.

N.J.S.A. 10:5-12(d).  The prima facie requirements for retaliation under Title VII mirror the

requirements under NJLAD.  Because this Court has found that Plaintiff does not establish a case

of retaliation under Title VII, she necessarily cannot establish a case of retaliation under NJLAD.

*Hopkins v. Elizabeth Bd. of Educ.*, 2005 WL 1899333 (D.N.J. 2005).  Therefore, Plaintiff's

retaliation claims under NJLAD, as set forth in part in Count Seven of her Complaint, shall be

dismissed.

### H.      Plaintiff's § 1983 Claims

        Title VII and § 1983 claims require the same elements for their causes of action and

courts incorporate the same standards when assessing the employment discrimination claims.

*See Behrens v. Rutgers University*, 1996 WL 570989 (D.N.J. 1996); *Whiting v. Jackson State

Univ.*, 616 F.2d 116, 121 (5th Cir. 1980); *Boutros v. Canton Regional Transit Authority*, 997 F.2d

198, 202 (6th Cir. 1993).  However, most circuit courts, including the Third Circuit, have held

that "[T]itle VII is not the exclusive remedy for discrimination claims against state or municipal

employers, where those claims derive from violations of Constitutional rights."  *Annis v. County

of Westchester*, 36 F.3d 251, 254 (2d Cir. 1994); *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d

1064, 1079 (3d Cir. 1990) ("Title VII does not preempt § 1983, and . . . discrimination claims

may be brought under either statute or both"); *Johnston v. Harris County Flood Control Dist.*,

869 F.2d 1565, 1573 (5th Cir. 1989) (injured public employee may pursue remedy under § 1983 for First Amendment violations as well as under Title VII when employer's conduct violates both Title VII and a separate constitutional or statutory right).

However, Defendants did not address Plaintiff's § 1983 claims in their moving brief, but instead raised their objections to said claims for the first time in their reply brief.  Therefore, as Plaintiff is unable to respond, the Court will not consider Defendants' arguments concerning the § 1983 Counts Three, Four and Five at this time, but will await a properly directed motion.  *See Elizabethtown Water Co. v. Hartford Casualty Ins. Co.*, 998 F. Supp. 447, 458 (D.N.J. 1998) (finding that "[i]t is axiomatic that reply briefs should respond to the respondent's arguments or explain a position in the initial brief that the respondent has refuted"); *Machulsky v. Hall*, 210 F. Supp. 2d 531, 534 n.1 (D.N.J. 2002) (holding that court's may and often do disregard portions of reply briefs that raise "new" facts); *Bayer AG v. Schein Pharmaceutical*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (same).

## IV.    CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Complaint under Rule 12(b)(6) is granted in part and denied in part.

s/Garrett E. Brown, Jr.
**HONORABLE GARRETT E. BROWN, JR**
**CHIEF UNITED STATES DISTRICT JUDGE**

Dated: August 31, 2006

-22-